

FILED
11/4/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
KE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

UNITED STATES,

       Plaintiff,

vs.

HOWARD LEVENTHAL,

       Defendant

Case No.: 13-cr-844

JUDGE ANDREA R. WOOD

# DEFENDANT'S SECOND MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE UNDER 18 U.S.C. § 3583(e)(1)

NOW COMES DEFENDANT Howard E. Leventhal, a non-attorney acting *pro se*, hereby respectfully submitting this Second Petition for Early Termination of Supervised Release, under 18 U.S.C. § 3583(e)(1). In support of this motion, Defendant states as follows:

## BACKGROUND

1.    Leventhal hereby restates the factual assertions of his initial petition for early termination Doc No 15 and states further as follows: In December 2013 the defendant pled guilty to one count of wire fraud and one count of aggravated identity theft in the interceding matter, Case No. 13-cr-695(BMC) in the United States District Court, Eastern District of New York (the

"EDNY Case")[1]. On September 12, 2015, fourteen months prior to sentencing, defendant was remanded to custody of the Bureau of Prisons for alleged violations of conditions of pre-trial release terms, denied by the defendant.

2.      On December 6, 2016, defendant was sentenced in the EDNY Case to 60 months imprisonment to be followed by three years of supervised release[2], (See Exhibit A) with credit for time served in pre-sentence detention. Defendant was ultimately transferred to two succeeding minimum security federal prison camps after spending 17 months in the maximum security Metropolitan Detention Center, Brooklyn, NY; a facility referred-to in published reports by EDNY Federal Magistrate Judge Cheryl Pollak as being like a "Third World Prison[3]."

3.      Subsequently Leventhal was transferred from Federal Prison Camp Duluth to a Residential Re-Entry Center in Chicago on April 12, 2019 and transferred to home confinement on May 16, 2019.  Defendant's period of imprisonment (per official record of the Bureau of Prisons) ended on December 12, 2019, the day his period of supervision by Probation should have begun under controlling law. Defendant claims that inception of supervision under authority of United States Probation actually began six months earlier, during late May or early June 2019. The Government disagrees.

_____

[1] Note that while this matter was originally filed in this court under this case number, it was almost immediately transferred to the United States District Court for the Eastern District of New York, (EDNY) where the bulk of proceedings took place.

[2] The sentencing court initially ordered 5 years of supervised release, however after being advised that the law did not allow a term exceeding three years, amended the judgment downward to three years of supervised release. See amended Judgment of Conviction, EDNY Doc 177, Exhibit A hereto.

[3] See https://patch.com/new-york/sunset-park/federal-judge-appalled-third-world-brooklyn-prison

4.     Mr. Leventhal no longer wants to be on supervision and has filed two motions requesting termination of his supervised release; the first filed in May 2020 in this matter[4] and the second (instant) motion filed on November 4, 2020, to which Leventhal requests that the Court now responds and rules.

5.     During the proceeding in this matter which took place on July 30, 2020, Mr. Leventhal's currently-assigned NDIL Probation Officer Jay Nichols, while objecting to the earlier petition for termination, stated on the record that he did not foresee any objection to granting a later petition, provided that the effective date would be no earlier than December 12, 2020. The Government agreed.

6.     The Government stated two objections to Leventhal's earlier petition: 1) That the statutory minimum for early termination under 18 U.S.C. § 3583(e)(1) of one year under supervised release had not yet been met; and 2) that there was some (vaguely articulated) joint concern on behalf of both the Government and Probation that Leventhal had not complied with the sentencing court's order for behavioral health care during supervised release. Over the four months since the Government and Probation stated these two objections on the record, no new objections, notices, complaints or filings on their parts expressing objection to terminating supervised release early have been asserted.

7.     On December 12, 2020, according to the reckonings of this court, the Government and Probation, the statutory minimum of one year under 18 U.S.C. § 3583(e)(1) will be met in this case, allowing for grant of early termination on said date.

_____

[4] Denied without prejudice for being prematurely filed.

**DISCUSSION**

8.    The Government and Probation have been on crystal clear notice that Leventhal is seeking early termination for six months prior to this instant filing. There is no cause to allow them to forward new objections now, should they attempt to do so.

9.    Leventhal's instant motion to terminate supervised release is based on § 3583(e)(1), which allows the Court under certain circumstances (presented here) to terminate a term of supervised release "at any time after the expiration of one year of supervised release." 18 U.S.C. § 3583(e)(1). Section 3583 generally governs inclusion of supervised release after imprisonment and provides for specific terms of supervised release for various categories of crimes, the factors to be considered by the court, conditions of supervised release, as well as early termination, modification and revocation. In particular, "[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(c), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)-terminate a term  of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). "The language in this statute is discretionary, and the district court has wide discretion in determining whether to terminate an individual's term of supervised release." *U.S. v. Hook*, 471 F.3d 766, 771 (7th Cir. 2006).

10.    At threshold, as of December 12, 2020, Leventhal meets the one-year requirement set forth in section 3583(e)(1).  As for Section 3553(a)(1) (the nature and circumstances of the offense and the history and characteristics of the defendant), while the offenses for which Leventhal was convicted are serious, they are non-violent.  It is significant that the Probation

Department's representation that Leventhal, who is 64 years of age, has meaningfully complied with the Judgment of Conviction's major terms of supervised release.

11.     Mr. Leventhal's sworn, self-authored "Post Release Report," ("PRR," Exhibit B hereto) (SEALED) shows that Leventhal maintains a stable residence, provides nearly 24/7 in-home care for his 95 year old mother and is enrolled with low fee senior citizen status and financial aid covering the entire cost of a college program leading to a Bachelor of Science degree in Architectural Engineering (Exhibit B).  He has performed "tech-temp" temporary work gainfully on occasion and receives Social Security retirement income.  As a full-time undergrad engineering student, full-time elder caregiver and part time electronics technician, Leventhal's time is fully consumed with pro-social activities. He is under no pressure (like the pressures he was under during commission of his criminal acts) for the daily expenses of living.  None of the commonly widespread deleterious economic harm of the COVID Crisis have meaningfully affected him negatively, according to him.  He and his mother occupy the same household, both qualify for and receive full coverage government-funded medical care as well as more than sufficient retirement income, so there are no money pressures in the defendant's home. Moreover, Leventhal had no criminal history prior to his conviction on the present offense. On balance, these factors weigh in favor of early termination.

12.     As for Section (a)(2)(B) (affording adequate deterrence to criminal conduct), the deterrent value of this case has been fully realized and that there is no longer any need to keep Leventhal on supervised release. His offenses were non-violent and he served an extended prison sentence. He will be within 8 days after the hearing on this instant motion, of completing one year towards his term of supervised release.  He was compliant was court-imposed fees and restitution to the limit of his ability (see Exhibit B PRR).

13.     As for Section (a)(2)(C) (to protect the public from further crimes of the defendant), as noted above, Leventhal is now less than one year to his 65th birthday. The likelihood of recidivism by an over-65 offender is very low. See *U.S. v. Nellum*, No. 2:04-CR-30, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (observing that "under § 3553(a)(2) (c), age of the offender is plainly relevant to the issue of protecting the public from further crimes of the defendant.") (citation and internal quotation marks omitted).  Moreover the Probation Department indicates that Leventhal is on low-activity supervision because he qualifies as a low-risk offender.  His current pursuit of college-level education as a freshman among 18 year-olds, 45 years after dropping out of college, indicates newfound humility, pro-social, contributory and productive inclinations. His employment and retirement income status indicate that he has returned to a stable environment and therefore presents a lower risk of recidivism. These considerations weigh in favor of early termination.

14.     As for Section (a)(2)(D) (to provide the defendant with needed medical care), Leventhal was materially neglected in terms of medical care for a serious medical condition. The sentencing court made it perfectly clear to the Bureau of Prisons that Leventhal required specialized medical care while imprisoned. Yet, there is nothing in Bureau of Prisons records establishing that he received any such care and no such care was provided. Rather, such care was actively and deliberately denied.

15.     Although Leventhal states that he was re-certified medically as an FAA-licensed pilot after release, according to subsequent medical testing and reports, he suffers serious degradation and exacerbation of his principal medical condition as a result of neglect while imprisoned, according to his physician (Exhibit C). The most clear and present consequence of this degradation has arisen from the extraordinarily elevated number of bathroom trips which

Leventhal must suffer daily – which produces the further collateral effect of rendering Leventhal's earlier-expressed wish and intent to pursue a post-release career as a flight instructor providing "dual" instruction in small aircraft without lavatories, nearly impossible and surely impractical.

16.     While Leventhal may or may not be in the final stages of life, it is likely that medical neglect during incarceration shortened his life expectancy. These considerations also weigh in favor of early termination. See *Nellum*, 2005 WL 300073, at *4 (observing that Section 3553(a)(2) requires judges to impose sentences that effectively provide the defendant with needed medical care).

17.     Both the Government and Probation claimed in the previous early termination proceeding that Leventhal has somehow himself been non-compliant, un-cooperative or refused to comply with the Court's order regarding mental health care. Rather in fact, Leventhal in terms of provider encounter frequency has exceeded Probation's requirement (Exhibit B PRR). Moreover Leventhal claims that Probation initially assigned an unlicensed, unqualified social worker to him, that said social worker was not only one third his age, unfamiliar with patients of his background but also, although "a perfectly respectable young woman" not up to the task of providing any useful therapy to Mr. Leventhal, according to him. The successor (qualified, licensed) psychotherapist's report (Exhibit D) indicates that Leventhal is in more than full compliance with the court's sentencing order in terms of frequency of treatment sessions, which mandates no particular clinical outcome. Said report also suggests that Leventhal would benefit on a clinical behavioral level from termination of supervised release without delay and that continued supervision would be harmful to Mr. Leventhal.

18.     Family ties are pertinent under § 3553(a). *Nellum*, 2005 WL 300073, at *4. Mr. Leventhal forcefully claims in numerous filings on record in this court during 2020 that his "cherished relationship with his beloved daughter" was deliberately destroyed by EDNY Government and Probation personnel – as a *quid pro quo* provided to Mary Handeland, his second ex-wife[5] for perjured testimony during the sentencing phase of the EDNY Case.

19.     In summary, Leventhal claims that Handeland (adoptive mother of his adopted daughter) was coached and suborned to perjury by the EDNY Prosecutor and EDNY Probation's PSR writer to falsely advise the sentencing court 1) That Leventhal's medical condition was not as serious as Leventhal claimed; and 2) That Leventhal presented some sort of threat to his daughter. Leventhal contradicts and his many personal reference letters (Exhibit E) support, that for the entire duration of his adopted daughter's life prior to being cut off from her by Probation, neither his ex-wife nor any other person ever once wrote or uttered a single word to him or about him in the remotest way suggesting that he (Leventhal) posed any sort of threat to his daughter – and that rather, diametrically the opposite is true. This offensive, globally false, ludicrous, fictitious set of accusations were concocted by EDNY personnel according to

---

[5] Leventhal claims that his divorce proceeding from Mary Handeland, in *Handeland v. Leventhal*, Case No. 05 D 808, 19th Judicial Circuit Court, Lake County, Illinois was hotly contested and ran as one of the longest duration unresolved divorce cases in local history; and that Handeland concealed, among other things, a drug trafficking arrest of herself, a suicide attempt, "decades" of premarital antipsychotic prescription drug use and other psychiatric treatment – serious, material, core issues in adoption and nothing of which was disclosed to either the Defendant, the PRC Government or the U.S. State Department prior to international adoption of Defendant's daughter in China. Defendant further claims that this failure to disclose constituted a federal felony on the part of his ex-wife, under 18 USC § 1001, False Claims in federal proceeding, for the singular purpose of perpetrating theft by deception of enormous sums of money, assets and parental rights from Leventhal. Defendant further claims that part and parcel to the *quid pro quo* delivered to Handeland by the Government and Probation for Handeland's perjury in this matter, amounted to furtherance of concealment of these crimes, by isolating the Defendant in prison for "as long as possible" (see Handeland's sealed letters to the sentencing judge in record of the EDNY case, during 2016).

JUDGE ANDREA R. WOOD - 8

Leventhal's analysis and interpretation, solely for purposes of committing fraud upon the sentencing court by the Government, making a fool of the sentencing judge to (successfully) produce and publicize Leventhal's unduly lengthy sentence, to self-promote and self-amplify the prosecutor's monetary income in his current, post-public-service private practice - with no basis in fact whatsoever. The Government denied none of this in its answer to Leventhal's original petition for early termination and therefore has admitted these allegations as true.

20.     The medical consequences suffered by Leventhal while neglected in prison speak for themselves as to the falsity of the ex-wife's claim that Leventhal exaggerated assertions about his medical condition prior to imprisonment. Nothing of Mr. Leventhal's allegations as summarized in the above two paragraphs and asserted in his earlier petition have been denied by the Government; therefore the court is obliged to deem them true. The court must accept as true all undenied factual assertions in the (litigant's) submissions and resolve all disputes regarding relevant facts in the (litigant's) favor. *John Walker and Sons, Ltd. v. DeMert Dougherty, Inc.*, 821 F.2d 399, 402 (7th Cir. 1987); *Oce-Office Systems, Inc. v. Eastman Kodak Co.*,805 F. Supp. at 643; *Neiman v. Rudolf Wolff Co.*, 619 F.2d at 1190; *Hexacomb v. Damage Prevention Products,* (N.D.Ind. 1995), 905 F. Supp. 557, 560 (N.D. Ind. 1995)].  These considerations weigh in favor of early termination, particularly so that Mr. Leventhal may attempt to re-establish contact with his daughter while she is still in college and still resides within driving distance of him, without further interference by the Probation Department.

21.     As for Section (a)(7) (the need to provide restitution), according to his sworn Post-Release Report (Exhibit B), Leventhal has paid more than the amount of restitution mandated by the terms of supervised release. He expresses a wish and intent to continue paying restitution to whatever extent is practical and manageable, directly to his victims regardless of

any order compelling him to do so, for among other reasons, he has no confidence in the Government to competently, properly or correctly distribute such funds.

22.     As to satisfying the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a) regarding the need to avoid sentencing disparities[6] and the principle of sentencing "not greater than necessary," two closely and directly comparable cases which produced sentences orders of magnitude less harsh than that imposed in this case. The first, in the same district and court where Leventhal was sentenced is Case No. 11-CR-255, United States District Court Eastern District Of New York *in United States v. Klein.* The second is *U.S. v. Matassa*, Case No. 17 CR 373 before Judge Matthew Kennelly of this court.

23.     Matassa's PSR writer penned the following statement about Matassa: "Defendant is a Chicago native who had a seemingly normal upbringing[7]," when in fact Matassa and his family according to decades of published newspaper reports, were publicly identified innumerable times as being high ranking members of a Chicago Organized Crime family. See Chicago Tribune article June 22, 2019: "*Reputed 'made' member of Chicago Outfit given 6 months in prison for embezzling from union*"[8].

24.     Neither Howard Leventhal nor any known member of his family going back to their immigration into the United States in the late 1800s, had ever once entered a criminal court, aside from traffic, claims Leventhal.  Matassa stole irreplaceable labor union retirement and

---

[6] 18 U.S.C. Section 3553(a)(6) requires sentencing judges in federal court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."
[7] 1:17-cr-00373 Document #: 67, Page 10 of 16 Page ID #:774
[8] https://www.chicagotribune.com/news/criminal-justice/ct-reputed-chicago-mob-figure-sentencing-20190722-kahyuutmzvc7jpnu6uqvc6oiz4-story.html

medical funds for his personal consumption. Leventhal claims that he committed his admittedly criminal acts to fund an authentic technology development company under desperate circumstances in the aftermath of the 2008 stock market crash, while supporting three families including one with a dying (earlier) ex-spouse who needed otherwise unobtainable 24/7/365 care. He also claims that he took extraordinary care to make certain that his victims could withstand and recover from the losses he produced; not that any of this excuses the criminal conduct to which the defendant admitted.

25. John "Pudgy" Matassa's age at the time of sentencing was within a few years of Leventhal's age at sentencing. Both had serious medical issues yet the prosecutor in Matassa's case did not waste more than a year of Matassa's life trying to invalidate the presence of these issues, as the prosecutor did in Leventhal's case, producing manifest physical harm in the present day to Leventhal. Decades of published reports show that Mr. Matassa was a lifelong professional criminal from a family of lifelong professional criminals. Matassa was sentenced to 6 months versus the 60-month sentence for Leventhal. Matassa's parent-child relationship was not deliberately destroyed by the Government and Probation as a *quid pro quo* for a confidential informant's perjury, as Leventhal's was. This comparison establishes a **gross and unwarranted sentencing disparity of 1,000%** when measured in simple numbers. It is exceedingly difficult however in practical terms, to precisely enumerate the harm caused to Leventhal and his daughter, by the deliberate destruction of his relationship with his daughter – not suffered by Matassa. The Matassa comparison however pales in comparison to Klein.

26.    Philip Klein was in the same age range at sentencing as Matassa and Leventhal, also with serious medical conditions[9]. Klein embezzled funds allocated for the support of children and federal Head Start Program monies. To the extent monies obtained illegally by Leventhal were not used for bona fide business expenses, the remainder was used (according to Leventhal) to support an ex-spouse afflicted with Multiple Sclerosis dying in agony and the humiliation of the loss of body function control; as well as Leventhal's aged parents, his daughter adopted as an abandoned foundling in China; and Leventhal's stepchildren. Klein was sentenced to one day of imprisonment – an **unwarranted sentencing disparity of 1,825 times or 182,500% versus Leventhal**.

27.    What explains these disparities? Mr. Leventhal expresses an unsupported misconduct conspiracy theory, however the sentencing disparities speak for themselves to establish that the sentence in Leventhal's case was far greater than necessary, particular in light of the deliberate destruction of relationship between the Defendant and his only child, which the Government has not denied was planned and executed by EDNY Prosecution and Probation, among others. It is unsurprising from Leventhal's viewpoint, that he is repulsed by the thought of any ongoing contact whatsoever with Probation personnel going forward.

28.    Lastly, the public interest is best served by terminating Leventhal's supervised release because this will allow the Probation Department to invest the public's limited resources on those who are truly in need of supervision. Due to the current Coronavirus Crisis especially, Probation staffers are quoted on public record[10] stating that an above normal rate of early releases of vulnerable prisoners have placed them (probation officers) under an excess, unmanageable burden. There is no benefit to be derived by maintaining supervision at public expense over someone like Leventhal who has shown himself to be beyond the need for

---

[9] See "Amended Statement of Reasons" in Klein case, dated December 27, 2011.
[10] See for example: https://www.themarshallproject.org/2020/04/03/probation-and-parole-officers-are-rethinking-their-rules-as-coronavirus-spreads

supervision, to have been directly harmed by Probation officers without justification or legal basis and to whom some minimal opportunity is surely due, to re-establish some manner of contact and relationship with this daughter, which has been unduly barricaded-against by Probation itself, while reconnection may remain practicable and possible.

29.    As to the yellow-highlighted passages of Leventhal's proposed order (Exhibit F), Leventhal requests that this language or language similar to it is necessary for inclusion in the court's published order – so that in light of all the falsities and outlandishly exaggerated media hype self-generated by the Government in this matter for purely, solely commercial, career promotion purposes of individual DOJ and Probation public servants – Leventhal may have some officially sourced evidence at his disposal as a foundation upon which to begin correcting the record in the mind of the only person whose personal beliefs matter to him for the remainder of his life: his daughter.

**PRAYER**

Defendant Howard Leventhal respectfully requests and prays that this Second Motion for Early Termination of Supervised Release is **GRANTED to be effective 12:01AM CT December 12, 2020**; and that language reasonably similar to that of the Exhibit F proposed order is incorporated in this court's ruling responding to this motion.


RESPECTFULLY SUBMITTED,


_____ Date: November 4, 2020

Howard Leventhal
Defendant *pro se*

# INDEX TO EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | (Amended) Judgment of Conviction, Doc No. 177 in the EDNY Case |
| B | Defendant's Sworn Post-Release Report (PRR) (SEALED) |
| C | Physician's Report (SEALED) |
| D | Psychotherapist's Report (SEALED) |
| E | Personal Reference Letters |
| F | Proposed Opinion and Order |
| | |

# Exhibit A

**Amended Judgment of Conviction**

**FILED**
★ OCT 19 2017 ★
U.S. DISTRICT COURT E.D.N.Y.
BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| Howard Leventhal | ) Case Number: 13cr00695-BMC |
| | ) USM Number: 46376-424 |
| | ) Steven Zissou, Esq. |

**Date of Original Judgment:** 12/6/2016
*(Or Date of Last Amended Judgment)*

Steven Zissou, Esq.
Defendant's Attorney

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))
☑ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)
   Supervised Release

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
☐ Direct Motion to District Court Pursuant  ☐ 28 U.S.C. § 2255 or
   ☐ 18 U.S.C. § 3559(c)(7)
☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☑ pleaded guilty to count(s)   Counts 1 and 2 of the Information
☐ pleaded nolo contendere to count(s)
   which was accepted by the court.
☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §1343 | Fraud | 10/22/2013 | 1 |
| 18 U.S.C. § 1028(a)(1) | Aggravated Identity Theft | 10/22/2013 | 2 |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)
☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/6/2016
Date of Imposition of Judgment

/S/(BMC)
Signature of Judge

BRIAN M. COGAN                U.S.D.J.
Name and Title of Judge

10/18/2017
Date

DEFENDANT: Howard Leventhal
CASE NUMBER: 13cr00695-BMC

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Count 1: 36 months custody
Count 2: 24 months custody to be imposed consecutive to count 1 for a total of 60 months imprisonment

☑ The court makes the following recommendations to the Bureau of Prisons:

The defendant be designated to either FCI-Oxford or a Correctional Medical Facility in Illinois. He is from Illinois, he has family in Illinois, and he has a serious medical condition that may require rapid response.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

DEFENDANT:  Howard Leventhal
CASE NUMBER:  13cr00695-BMC

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

Count 1: 3 years.
Count 2: 1 year to run concurrent  to count 1 for a total of 3 Years.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT:   Howard Leventhal
CASE NUMBER:   13cr00695-BMC

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____   Date  _____

DEFENDANT: Howard Leventhal
CASE NUMBER: 13cr00695-BMC

## SPECIAL CONDITIONS OF SUPERVISION

l) The defendant shall comply with the restitution and forfeiture orders.

2) The defendant shall make full financial disclosure to the Probation Department.

3) The defendant shall not incur any new bank accounts or lines of credit, and shall not secure investments from individuals or businesses, without the permission of the Court or the Probation Department.

4) The defendant shall participate in a mental health treatment program as approved by the Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay.

5. The defendant can not commence any civil litigation, nor seek to reopen any closed civil case, without the Court's permission, which will be granted if the Court determines that there is a colorable basis for the proposed claim.

6. The defendant shall have no contact in any form, whether in person, by mail, telephone, email, or other electronic means, with any victim of the offense conduct or relevant conduct, as defined by a list with which the Probation Department will provide him, without prior permission of the Probation Department.

DEFENDANT: Howard Leventhal
CASE NUMBER: 13cr00695-BMC

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ | $ 1,350,819.78 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Paragon Financial Group | $800,000.00 | $800,000.00 | |
| CVA Partners | $175,819.78 | $175,819.78 | |
| Vincent Hseieh | $50,000.00 | $50,000.00 | |
| David Spector | $25,000.00 | $25,000.00 | |
| Can Capital Asset Services | $300,000.00 | $300,000.00 | |

*Payees info known to the govt

| TOTALS | $ 1,350,819.78 | $ 1,350,819.78 |
|---|---|---|

☑ Restitution amount ordered pursuant to plea agreement $ 1,350,819.78

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for   ☐ fine   ☑ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Howard Leventhal
CASE NUMBER: 13cr00695-BMC

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☑ Lump sum payment of $ ___200.00___ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

    Restitution in the amount of 1,350,819.78, due immediately and payable at a rate of $25 per quarter while in custody, and at a rate of 10% of his gross income per month while on supervised release. Contact information for payees known to the Government.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# Exhibit B

**Defendant's Sworn Post-Release Report (PRR)**

(See **SEALED** exhibits filed contemporaneously herewith)

# Exhibit C

**Physician's Report**

(See **SEALED** exhibits filed contemporaneously herewith)

# Exhibit D

**Psychotherapist's Report**

(See **SEALED** exhibits filed contemporaneously herewith)

# Exhibit E

**Personal Reference Letters**

## SWORN AFFIDAVIT OF DR. GREGGORY A. YOUSTRA

I, Greggory A. Youstra do hereby solemnly swear and affirm as follows: I am a father, grandfather, 65 years of age and a resident of Cook County for more than thirty eight years. I was a public school teacher for 38 years and hold a doctorate in education. I am a 8th degree black belt master instructor in TaeKwon-Do and have taught self defense and violence avoidance to thousands of children.

My family and I have known Howard E. Leventhal for more than thirty years. Howard was a student of mine at Niles Township North High School in Skokie, Illinois and one of my earliest students to achieve black belt rank. My first independent teaching assignment for Howard was to instruct the early childhood class in Morton Grove's Park District.

Howard has always been a person who can be trusted to do what he says he'll do. I am very impressed by the way he has continued to support his ex-wife who is stricken with multiple sclerosis. His compassion in this case is noteworthy.

Howard and his wife went to China to adopt a beautiful baby girl named Amelia Wenying Handeland-Leventhal. Howard has shown much love and financial support for this child. He is a capable and committed father.

Howard is hard working and has always provided for those in his family. He helps support his mother and father who are elderly.

I have never heard or witnessed Howard intoxicated on alcohol or drugs. He has not taken illegal drugs, associated with criminals, or had any disputes with associates, neighbors, or law enforcement personnel.

In my opinion, Howard is an exemplary human being in every aspect of is life.

AFFIANT FURTHER SAYETH NOT.


_Greggory G. Youstra_          Date: _12-07-2005_


Subscribed and sworn before me this _7th_ day of _December_, 2005.

_Mary L. Ziniel_
[Notary Public]

OFFICIAL SEAL
MARY L ZINIEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES. 12-19-06

C000323

# SWORN AFFIDAVIT OF LINDA SINC

I, Linda Singer, do hereby solemnly swear and affirm as follows: I am a mother, 47 years of age and a resident of Cook County for 47 years. I have had principal roles in the raising of 2 children.

My family and I have personally known Howard E. Leventhal for more than 20 years. During this period I have witnessed Howard care for his ex-wife Judith, a totally disabled sufferer of chronic-progressive multiple sclerosis, along with others, in an utterly unselfish manner without regard to the burden upon himself. I am also aware that he is very close with a wheelchair bound disabled cousin and always available to help him.

Howard is very caring and will give 200% of himself to those who are special to him including his daughter, family and friends. Howard is the type of friend who is always available to help no matter how busy he is in his private and business life. Howard is an individual you can rely on. It will only profit Amelia to spend as much time as possible with her Dad. He possesses unconditional love for her and she is a huge part of his life.

Howard is a hard working, creative individual with an unparalleled work ethic. To my personal knowledge over more than two decades, he has never been arrested, taken an illegal drug, suffered from a substance abuse affliction or associated with criminals or otherwise unsavory characters.

AFFIANT FURTHER SAYETH NOT.

_Linda C Singer_ Date: _Nov_ 21, 2005

Subscribed and sworn before me this 21st day of 2005. [Notary Public]

C000328



Law Offices of Caroline Kaplan
5 south County Street | Waukegan, Illinois 60085
ph 847-899-3159 | Email: carolinekaplan@comcast.net

November 8, 2013

Steven Yurowitz, Esq.
Newman & Greenberg
950 Third Ave., 32nd Floor
New York, NY 10022                    RE: Howard Leventhal

Dear Mr. Yurowitz:

This letter is intended to provide a reference for your client Howard Leventhal, whom I have known personally since 2005 and represented since 2007 in family law matters in my capacity as an attorney licensed in Illinois.

Enclosed is a selection of other personal reference letters which were filed in Mr. Leventhal's divorce case long ago, in the 2005-2007 timeframe. In my view the statements made in these letters are an accurate portrayal. Also enclosed is a selection of news articles regarding real, legitimate computer and electronics products created and developed by Howard. I personally have seen operating demonstrations of the Voyager Mobile Internet TV created by Howard at USTelematics, as well as the VIVEE talking email software and service conceived and developed by Howard also at USTelematics.

My own personal observation of Howard is that he is lovingly devoted to his family, including his 88 year old mother who Howard supports, his first ex-wife Judith who Howard has financially supported for 25 years and his deceased father who Howard supported for 30 years after a business failure. Most particularly Howard is a magnificent father to his now 13 year old daughter who Howard adopted from a Chinese orphanage in 2002. I have requested a copy of the adoption agency home study which addresses Howard's fitness as a father among other things and will forward as it becomes available.

Howard is also extraordinarily supportive to his first cousin Neal Golden, a paralyzed quadriplegic of 30 years duration. He frequently visits Neal at his home to repair and maintain Neal's computers and electronics, has repaired Neal's wheelchair and adaptive equipment on numerous occasions and provides continuous emotional support to Neal's parents, Fern and Jerry Golden. Mr & Mrs Golden are elderly, lost their daughter at an early age to cancer and have taken care of Neal at home for all of the time since his crippling motorcycle accident. Howard calls them frequently, visits them with this daughter frequently and makes his aunt, who now can never be a grandmother, feel like a cherished grandmother none the less.



Howard is also a blackbelt in Taekwon-do and simultaneously a gentle and nurturing person. He has taught self defense to hundreds of children in addition to women and men, almost entirely on a volunteer basis. One of Howard's earliest students was Senior Master Earl Weiss who is now an 8th degree blackbelt and one of the highest ranking Taekwon-do masters in the world. To my knowledge Howard has also begun to teach martial arts to his daughter for personal defense purposes and character-building. Just this year he spent parts of the summer with her at Judo camp in South Carolina and Taekwon-do camp in Fox Lake, Illinois.

When my son Tommy, who was born prematurely and suffers from severe and permanent disabilities and was permanently admitted to the Misericordia Home in Chicago, a group care facility, Howard accompanied me, comforted me and emotionally supported me on what was arguably the worst day of my life. Around the same time Howard attended a Misericordia fund raiser and donated enough money to purchase an entire table of seating for my friends, family and guests.

Howard's inventions and product developments have been in the hands of millions of people and he is an important and productive contributor and teacher to the people and community around him. Many people rely upon him both emotionally and financially.

Very truly yours,

Caroline Kaplan

Caroline Kaplan



# ALBERT L. WYSOCKI
*A Professional Corporation*
ATTORNEYS AT LAW
325 WASHINGTON STREET
SUITE 200
WAUKEGAN, ILLINOIS 60085-5520

ALBERT L. WYSOCKI

BAILEE D. MYERS

PHONE 847.244.3030
FAX 847.244.3003
ALW@albertwysocki.com
BDM@albertwysocki.com
www.albertwysocki.com

December 12, 2013

The Honorable, Sentencing Judge
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge:

I am writing this letter in connection with the sentencing of Howard Leventhal. Of course, I am aware of the fact that he will very soon be entering a plea of guilty. The purpose of my correspondence is to tell you what I know about Howard, not only as a friend but as a practicing attorney for over thirty-five years, which included a period of time on the Nineteenth Judicial Circuit bench as a judge in Lake County, Illinois. I've been a police officer, then the Chief Deputy Sheriff of Lake County, and I've held prosecutorial positions throughout my career as well.

I first met Howard inadvertently due to my active participation at Prince of Peace Catholic Church in Lake Villa where my family and I have been long time, active members. Howard enrolled his lovely daughter, Amelia, at our parochial Catholic School at Prince of Peace. Our paths crossed when I participated with Howard in many of the support activities for the parish and its school. Howard always demonstrated kindness, charity, hard work and active participation in supporting the parish school where his daughter attends.

At first we became acquaintances and then friends. I came to learn, after many personal and private discussions with Howard, about his tremendous charity and responsibility that he demonstrates on behalf of his family. As you may come to know, Howard is greatly valued, loved and appreciated in the community which I know him, that being Prince of Peace Catholic Church and School.

I know that Howard supports his deathly ill first wife extraordinarily beyond what anyone could possibly imagine as well as he continues to support his second ex-wife. He is committed to a personal, loving and kind relationship to his daughter, Amelia, and his quite elderly and financially distressed mother as well. I have never heard him use profanity or express any negative comments or recriminations about anyone.



I am a seasoned, long time practicing criminal defense attorney and former judge. As a consequence of my professional experiences, I believe I have developed a very accurate perception of the people whom I come in contact with. I can represent to you, Your Honor, that my observations, experiences, and interactions with Howard for over the last eight years confirms my belief in his kindness, goodness, and charity with which he conducts his relationships with the people whom he knows, interacts with and loves. I am confident that my recommendations to you of Howard's character and goodness are accurate. If in your determination as to the appropriate sentence for Howard that he receive a rehabilitative sentence as opposed to a punitive one, I would certainly offer my skill and professional standing in a supplementary or supervisory role of any probationary disposition you might order.

I am a life long resident of Lake County, Illinois and I know Howard has lived here for many, many years. I am familiar with and conversant with all of the County and State agencies of the Lake County Court System and its personnel from top to bottom. I would be more than willing, indeed it would be an honor, if you felt you could rely on me in supervising any probationary sentence.

Howard Leventhal is a good man. It is my considered opinion that a removal of Howard from the interaction that he currently has with his two ex-wives, his daughter and his elderly mother would literally cause a much greater hardship on these women to their detriment with Howard's absence. I ask you to extend your discretion and consider this plea for mercy and rehabilitative community based sentencing alternatives for Howard here in Lake County, Illinois.

Very truly yours,

Albert L. Wysocki
ALW:dd

Fern Dawn Golden
1700 Paddock Lane
Lake Forest, IL 60045
847-525-6505

November 5, 2013

Mr. Steven Yurowitz
syurowitz@newmangreenberg.com
Newman and Greenberg
950 Third Ave
New York, NY 10022          SUBJECT: Howard Leventhal

Mr. Yurowitz:

I am a lifelong resident of the Chicago area and have known Howard Leventhal for 55 years. My husband and I operated a financial services business for 35 years serving the needs of lower income factory workers in the City of Chicago.

Howard is a relative but not a blood relative. In one sentence the way I would describe Howard would be that he is among the most kind, kindly, kindhearted, big-hearted, good-natured, good, benign, compassionate, caring, altruistic and humanitarian individuals I have ever had the pleasure of knowing. He lives to help others and while he surely enjoys life, the most joy I have seen him derive from life has been during those times of greatest service to others.

When Howard was admitted to 1st grade he had a reading comprehension equivalent of a 6th grader. While in 1st grade he could quote large portions of the World Book Encyclopedia, which he had been reading since age 4. When Howard was about 9 years old and his family invited us over for a summer barbeque, Howard relieved his father as the cook and from that day forward until today he has taken great pleasure as a quite alpha male in being the chef and serving the meal at countless family dinners.

My brother Sheldon took an early interest in Howard and mentored him to develop their lifelong mutual interest in flying and electronics. When Howard was 10 years old he sat alongside full grown men at the federal building in Chicago, demonstrated fluency in reading and sending morse code and advanced electronics theory and passed the government administered test for his amateur radio license at the FCC.

(

Howard's bar mitzvah speech at age 13, which he authored entirely himself and on his own initiative, was about the virtues of not following the crowd, not breaking the law, not taking drugs and serving others before himself. This has been the theme which has pervaded his life, not only in words but in deeds. I have never once heard Howard even joke about taking illegal drugs himself, and Howard tends to joke and reminisce about everything he does.

At age 15 Howard was elected to the board of directors of a non-profit public service corporation, and he was elected by a group of arms-length adults who were not his relatives. In working with this group Howard provided communications support for Project LEAP, a poll-watching group and personally safeguarded an underprivileged precinct during elections on the south side of Chicago. Also with this group he provided health, safety and welfare communications during MS Walks and other charity events and during fires and natural disasters around the Chicago area. On a volunteer basis at age 16 while in the Civil Defense Explorers, Howard re-stocked fallout shelters throughout the northern suburbs with food, water and other supplies.

Howard began martial arts training at 15, attaining his black belt and significant proficiency in Tae Kwon Do. He placed well in several college-level tournaments while he was still in high school. At 5' 6" he is the only one of his instructor's thousands of students ever to have bested his own 8th degree master instructor Dr. Greg Youstra, a man of 6' 4", in a consensual sparring match that ended with Dr Youstra's hospitalization. At the same time I have never seen or heard of Howard applying his formidable skills in any offensive way nor misapplying his skills in the slightest way. Beginning at age 19 Howard taught self-defense to children ages 5-10 at the Morton Grove Illinois Park District for a number of seasons.

. Howard began college at Southern Illinois University in Carbondale, Illinois but did not stay long because he could not bear to be away from his first girlfriend in Chicago. The next year he enrolled at the University of Illinois at Chicago and was unable to continue as his father began to fail in business.

In 1982 after Howard's father had some sort of breakdown arising from his business failure, Howard saw that his mother and father needed financial support and started his first company, Suncom, Inc. At Suncom Howard dissected the flimsy joystick controller for the newly popular Atari game and developed a highly durable replacement. The "SlikStik" and "StarFighter" were sold all over the world including at places like Target

and Toys R Us. Howard once related that while in Singapore on business he walked down the street and passed a peddler's pushcart selling joysticks from Howard's company.

For almost the entire 7 year duration of Suncom's existence before it was sold, Howard gave from one third to one half of his salary and bonuses to his mother. He also gave some money to his Great Aunt Molly who had cared for him as a baby. When the company was sold, the first thing Howard did was drive to the homes of his parents and his Aunt Molly to hand them bundles of cash. Not because they were investors in his company, and not because they were owed any money on any legal basis, but because they were investors in Howard's life and he was delivering upon his own personal code of conduct which demanded that he do it.

When Howard was in his early 20s my dear son Neal, Howard's first cousin, was devastatingly injured in a motorcycle crash. Neal was near death and in a coma for an extended period of time. Today Neal is nearly 100% paralyzed and my husband and I have cared for him at home for more than 30 years. I have attached digital video of a recent TV news story about Neal which provides a glimpse into his condition.

Howard's first reaction after Neal's long term outlook became known was to try fashioning some adaptive devices to ease Neal's challenges. Through the years Howard has gladly set up and repaired some of Neal's computers and electronics, and whenever called been at our door for this purpose at the soonest possible moment.

As shown on the TV news clip, Neal has made the most of his life by among other things attending as many Chicago Bulls basketball games as possible. Not long ago when Neal was re-admitted to the Rehabilitation Institute of Chicago, the upcoming game was blacked-out on local TV and Neal was quite unhappy. Upon learning of this during a visit to Neal, Howard went home and returned on the 60 mile round trip the next day with a fully functioning setup to play the Bulls game for Neal via a temporary streaming video feed over the Internet.

By far the greatest good thing Howard has achieved in his life was to travel to China for 16 days in 2002 and adopt his daughter Amelia Wen Ying Handeland-Leventhal.

Amelia had been abandoned in the womens' restroom of a train station near in a rural area of Hunan Province in Central China. She lived in an orphanage from her recovery by the police until Howard and his ex-wife Mary traveled there to retrieve her. Shortly

after Howard enabled Amelia to become an American citizen at the U.S. Embassy in Guangzhou, they came home to a welcoming party in my home. When it came time to say the prayers and do the blessings, Howard gave a speech to the assembled group of people who normally will not stop talking or fidgeting for a moment to save their own lives. In a very short time this group of people sat in rapt motionless silence.

Howard explained the thinking behind Amelia's name, which comes from two distinctly different sources. Firstly, Amelia is a westernization of the Aramaic "Al Maliya", meaning "Born by God" which could not be a better name for this adopted daughter who is so dearly loved by Howard. Secondly Amelia was named after aviator Amelia Earhart, and not only because of Howard's love for flying. Amelia Earhart was a symbol of the accomplishments of women and Howard said this name was chosen "because Amelia is an American now and in America … a woman can be anything she decides to be".

My daughter Laura passed away at a very young age and I will never be a grandmother. Howard has tried at every opportunity to bring Amelia into my life and keep Amelia in my life so that I can have some of the experience of being a grandmother. I need this to continue.

Further remarkable about Howard is the way in which he has provided financial and emotional support for his first wife Judi, who is also a quadriplegic. To his own great merit, detriment and sacrifice, Howard has supported Judi for 25 years and provided her with whatever she has needed including a round-the-clock caregiver. This support followed the earlier many years of support Howard provided his parents, overlapped it and continues to this day, when Howard still cares for his 88 year old mother, my sister-in-law Lila Leventhal.

Through my experiences with Neal I have met and know many people with disabled relatives. For the most part, after a certain time, the only way they can survive has been to institutionalize the individual. But Howard has so empathized with Judi that he has been unable to take this step and he has stood beside her and with her regardless of his subsequent marriages. There are few people on earth who would even consider this let alone actually do it for a quarter of a century.

Howard is an excellent father and is needed by his daughter who is now 13 years old. Regardless of the outcome of these current matters, the person who stands to be hurt the most is Amelia, and she has already recovered from a devastating abandonment, quite well, directly because of Howard's efforts and for no other reason that I am aware of.

When Amelia was still a young child and her mother (Howard's 2nd wife Mary) was too overwhelmed with motherhood, Howard would take Amelia wherever he went, even on business trips. When Mary and her lawyer made things very difficult for Howard by using Amelia as a hostage to be exchanged for material things – Howard signed over his interest in the house he had paid for entirely with his own money, without hesitation, so that he could have the time with Amelia that Amelia needs and deserves. Most people would go to endless war over an issue such as this, but not Howard. When it came time to relinquish a material thing gained at great cost, Howard gave it up willingly in exchange for nothing more than the freedom to enjoy an ice cream with Amelia at will.

Howard recently volunteered to coach Amelia's school robotics team. He has taken her flying in the airplane he rents at the inexpensive, non-profit flying club he has belonged to for many years. Last summer Howard ignited an interest in martial arts for Amelia by taking her to a Judo camp in the Carolinas and a Tae Kwon Do camp in Illinois. He coaches her privately and she already can break boards and deflect attacks even while being slight and weighing 70 pounds. Because Amelia is slight, she takes growth hormone injections which Howard administers to her whenever she is in his care.

In all the time I have known Howard, although he has been in plenty of mischief, it has been innocent mischief and he has never hurt anyone. At 5 years old, while I was watching him in my home, he disappeared and walked to his home, several miles away. He found a way into the locked house and when I arrived there after great upset to look for him, he was eating potato chips, watching TV and dreading the coming moment that I would find him.

Howard has never committed a crime or been accused of a crime as far as I am aware. When at our house he will not even take a can of soda without first asking permission. Howard knows that my husband and I are not as young as we used to be, and much of the time he visits with Amelia he brings food for everybody with special consideration for food that Neal can tolerate. When my daughter was near the end of her life, Howard also brought food, knowing that she could not eat it and hoping she could get some enjoyment from just smelling it or touching it to her lips. When Howard recently moved into a new home, the first thing he told me about it was that his criteria for enabling access for my son's wheelchair was satisfied, and that he had gone out immediately searching for wheelchair ramps suitable for Neal to pass over his threshold.

Howard is a productive member of society and he has much to offer. The video game and computer products he developed have served the needs and entertainment of many hundreds of thousands of people, all over the world. He once developed a computer graphics tablet called Animation Station and donated several to the Museum of Science and Industry in Chicago. For a number of years the public information graphic monitors on display all over the museum used the computer tablets that Howard created first with pencil on blank paper alone in his own lab.

Howard is an accomplished and noteworthy problem solver. When he thinks about solving problems, normally it is in the interest of the public good. For example he developed a product and service called VIVEE to reduce distracted driving by using a computer generated character to read aloud the email and text messages of drivers while driving. He wrote a book called "Are We There Yet, Road Trips in the 21st Century", which is still available on Amazon and proudly on display in my bookcase. The object of this book was to help parents everywhere solve the problem of keeping kids under control, entertained and intellectually stimulated while on long road trips. He developed a product called ICONtroller to solve the problem inherent in early laptop computers of needing to carry around an accessory mouse. As a pattern and practice in his life, he uses his intellect, which is formidable, to help not just those he loves or are close to him, but to help society at large.

Howard is not a consumer of luxuries or material items for himself generally speaking. He wears jeans and old clothes and drives a leased Chevrolet. Up until recently he drove a 10 year old car with 150,000 miles on it. It is obvious from the effusive support he has provided for his parents, ex-wife and daughter that this is where his lifetime income has gone. I understand that Howard is accused of fraud and is likely to plead guilty. Regardless there can be no productive purpose for depriving him of liberty under any guise or expressed cause, my feelings and emotions acknowledged and set aside.

Yours truly,

Fern Dawn Golden



Lorraine B. Marx
N17 W5195 Garfield Circle
Cedarburg, WI 53012

To Whom It May Concern
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

December 5, 2013

To Whom It May Concern.

My name is Lorraine B. Marx and I reside in the State of Wisconsin. I am retired from Kraft Foods. This reference letter is on behalf of Howard Leventhal who, I understand, plans to plead guilty to fraud in your Court.

I have known Howard Leventhal for the last twenty-eight years. I first met Howard in 1985 when he was the President of SunCom, Inc., in Chicago, Illinois and my daughter worked for his company. My daughter, Mary Handeland and Howard were married in October, 1999.

In 2002, Howard and Mary adopted my granddaughter Amelia who, as a baby, was abandoned in a remote area of the People's Republic of China. Howard's extremely proud of his daughter and always recognizes the importance of spending time with her or calling her on the phone.

Although we may have had differences of opinion in the past, ultimately I have known Howard to be conscientious, hardworking, generous and considerate person who has worked hard to

support his family and parents. Over the years, Howard developed many successful technology products. He is a talented man with many positive attributes that, if given the opportunity, could benefit the community.

I truly believe that Howard has already suffered extensively for his actions. He has lost credibility with his business associates and has expressed sadness by what he has put his family through. A prison sentence would cause irreparable harm to his young daughter. Therefore, I ask the court to take into consideration the importance of this critical relationship when considering his sentence as his absence in her life would be akin to yet abandonment for her.

Sincerely,

Lorraine B. Marx



JITING
MILIES
INDATION

EDITED

ACCREDITATION
FOR FAMILIES
DREN. INC

September 26, 2000

## Home Study for International Adoption

**Family:** Howard E. & Handeland, Mary Ann
2885 Farmington Drive
Lindenhurst, IL 60046
Home Telephone:      (847) 245-3066
Husband Work:          (847) 948-8200
Wife Work:          (847) 356-0781
I-600 Petition Filing Date: March 7, 2000
I-600 Fingerprint Clearance Date: June 26, 2000

### Interview Dates and Support Information:

This International Home Study was conducted by Uniting Families Foundation caseworker, Lynn L. Wetterberg. Interview dates of 2/4/00, 4/9/00, 4/14/00, and 5/21/00 include home and office contacts. As part of the overall Home Study, character references, medical reports, financial statements and income tax returns are reviewed and the family's home is inspected. This couple stated that they have never been rejected as prospective adoptive parents nor have they been the subject of an unfavorable Home Study. They stated that they have no history of substance abuse, sexual abuse, child abuse or domestic violence even if it did not result in an arrest. They also stated that they have never been arrested, indicted or convicted of any crime.

### Adoption Expectations:

Howard and Mary Ann, a childless couple, would like to adopt a Chinese infant of either sex, as young as possible, and under 15 months old. Although they would like a child who is as healthy as possible, they are willing to accept a child with a correctable condition. They would not accept a child with a diagnosis of Fetal Alcohol Syndrome. Both Howard and Mary Ann have been diagnosed and treated extensively for infertility conditions. This is a second marriage for Howard and a third for Mary Ann. Both say that their prior marriages suffered from the stress of infertility and they have chosen to create their family through adoption with relief and conviction. They are attracted to international adoption because they like the idea of providing a home for a child who would otherwise not have one. They appreciate the relative predictability of international adoption. Howard and Mary Ann believe a Chinese child will fit into their family system and their community with no difficulty. They stated that they have the enthusiastic support of friends and family.

Through extensive training the Leventhals have been made aware of the issues involved with adopting children from an institutional setting. Training included a discussion of the processing, expenses, difficulties and delays associated with international adoptions. They are also aware that the child they adopt might develop a previously undiagnosed medical or psychological condition following placement. The say that they accept this possibility and are willing to take this risk. Howard and Mary Ann state that they will assume full responsibility for the medical and financial needs of their adopted child upon placement and that they will fully cooperate with the Agency in its provision of post-placem

**Recommendation:**

I find Howard and Mary Ann Leventhal to be a mature, responsible and loving couple who have the emotional and financial ability to provide a nurturing home for a child. I highly recommend that the Leventhal's be allowed to adopt one healthy Chinese infant of either sex under fifteen months and as young as possible from China.

Uniting Families Foundation is licensed as a Child Welfare Agency by the State of Illinois and is authorized to place children for adoption under License #304862-02 which is in effect until April 17, 2001

_____          _____
Lynn L. Wetterberg, MS                            9/26/00
Caseworker                                              Date
Licensing Personnel ID #506969

_____          _____
Judith Tanter, LCSW, MS                           9/26/00
Casework Supervisor                               Date
Licensing Personnel ID #506721

Signed and sworn before me this ___26th___ day of ___September___, 2000.

_____
Notary Public

OFFICIAL SEAL
SHARON G. THOMPSON
Notary Public, State of Illinois
My Commission Expires 04/04/01



November 25, 2013

Sentencing Judge
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Sir/Madam:

I am writing in connection with the sentencing of Howard Leventhal, who I understand is entering a guilty plea with regard to his case. I have known Howard for at least 15 years, and from my working relationship with him, I have knowledge of his character and responsibility.

I am the CEO of EMSI Public Relations, a national PR firm, which I founded more than 23 years ago. I have managed publicity campaigns for Howard for the promotion of 3 of his products.

In all my dealings with Howard, I found him to be an honorable businessman, who kept his word in every agreement he made with me and my company, including meeting his financial obligations, i.e. he paid us fully and when expected. And just as important is the fact that the products he promoted were real and of value to consumers.

We got media for Howard to promote these three products:

A. 1998: We arranged TV interviews for Howard who was promoting Quicksite CD ROM Software (cutting-edge software that made it easy and economic for small business to develop a website, when previously such was cost prohibitive).

B. 2005: We arranged talk radio interviews around the country for Howard who was promoting his book, *Are We There Yet? Road Trips in the 21st Century.*

C. 2007: We arranged TV, radio and print coverage when he was promoting VIVEE, a voice interactive email for use in cars (at that time considered cutting-edge technology which promoted safety through hands-free use of digital devices while driving).

I hope this information is helpful in putting into context the type of person that Howard has been throughout the time I have known him - an honorable businessman who has promoted real products that have been beneficial to consumers.

Sincerely,

Marsha Friedman
CEO

November 20, 2013

To Whom It May Concern,

I am writing this letter on behalf of my friend of almost two decades, Howard Leventhal. I understand he will shortly be entering a guilty plea in court proceedings against him. I met Howard in 1995. I was working with a graphics arts company, who, at that time was one of the early pioneers of digital printing. Howard was working on some packaging projects and found digital printing to be helpful. Our shared sense of humor made us quick acquaintances and it wasn't long before we became friends. We had many lunches and eventually dinners including our wives. It wasn't long before I realized his kindness and generosity. We were invited to his cousin's house. His cousin is wheelchair bound and severely disabled from and accident years ago. There were several family members there, but it always seemed like it was Howard constantly looking after his cousin. I also had the pleasure of meeting Howard's parents. His father, too, had a great sense of humor, and over the years we have shared several laughs . Howard was very close to his dad and was there constantly until his dad passed. He has since been there in every way to make his mother's last years as comfortable as possible.

I later found out Howard is taking care of his first wife both compassionately and financially. She is suffering from a debilitating disease that requires both time and money. Just Howard doing what comes naturally . I also feel blessed to have been the very first person to greet Howard at the airport when he brought his beautiful new daughter Amelia home from China. He has been a loving, giving father ever since. Ho beams around her. I will regularly get texts on my phone with pictures / videos  of things Amelia is involved with.   Dancing, martial arts, and sometimes dad just bragging about how big and beautiful she has grown. Recently, Howard  called and asked if could stop by our home with Amelia. We were very glad to see both of them. The reason for his visit?  He wanted me, as a guitar player, to show Amelia how a professional could make her new guitar sound.  Here's the unusual part.   Howard BUILT the guitar by hand. I asked "why build one"?  He said "I thought it would be a little more special this way" "perhaps she will be a bit more motivated to spend the time to learn, knowing I didn't just run out to the store and buy one".

I know several people who participate in the Big Brother program.  They cannot stress enough, the importance of a male influence in a child's life. We have all seen the implications of children growing up without dads.  It would be doubly sad if Amelia were rescued from China, only to spend her time here, in her new country, fatherless.

It is difficult to share all of the great things I have witnessed Howard doing. I hope this sheds a bit of light on the kind of person I proudly call my friend.

Sincerely

Michael A Gianokopolous

President/co-owner  M & M Fasteners Inc.   Crystal Lake Illinois   60014  est. 1999

Home address :35672 N. Sheridan Dr. Fox Lake IL. 60020       1999 to present



4343 Commerce Court
Suite 618
Lisle, IL 60532
p: 630-799-1600
f: 630-799-1900
www.sbrllc.com

November 30, 2005

To Whom It May Concern:

My name is Dan Bleil. I am currently president of a credit union service organization providing financial services to businesses and professionals throughout the country, a proud father of two adult women, and a dear friend of Howard Leventhal. I have known Howard Leventhal both professionally and personally for more than 15 years. I have known Howard to be a caring and responsible man. He has demonstrated great patience and care with both his elderly parents and his ex-wife Judith, a disabled sufferer of multiple sclerosis. I also witnessed Howard's actions, attitudes and commitment throughout the arduous and burdensome process of adopting his daughter, Amelia Wenying Handeland-Leventhal. During this process, I observed Howard's loving and caring attempt to manage the process with the utmost care and attention to both his wife and their prospective adopted child. The process required an exceptional amount of time and resources in a foreign country in order to conform to the requirements of the child's country of origin. I was impressed with the way in which Howard handled this process with care and attention to the special and sensitive conditions of Amelia's origins.

Since the successful adoption of Amelia, many of our shared conversations revolve around his love and affection for his daughter. I have had the opportunity to spend many shared moments with Howard and Amelia as they play and interact with one another. It is obvious to anyone that knows Howard even casually, that his relationship with his daughter is the most important thing in his life. Furthermore, and more critical, Amelia's need for her father's love, care, and nurturing is indisputable.

I am compelled to assist Howard in his efforts to be afforded as much time as possible with his daughter as a result of my own experience with the judicial system in Illinois and its adverse impact on father's and their children. Too often the child's needs are deferred to the mother with little regard or attention to the relationship the child had, and needs to maintain, with their father. I would elaborate, but am confident that the plethora of written material supporting this most intuitively obvious situation requires little more supporting evidence than the look in the eyes of the father's child.

Howard is a hard working, creative individual with an unparalleled work ethic. In my opinion as father of two beautiful adult women, Amelia will be best served by a custody arrangement whereby Howard is afforded the greatest conceivable amount of time exclusively with Howard. Please feel free to contact me if I can provide any further support in my efforts to provide whatever is necessary to assist Howard and Amelia in maintaining the relationship they both need.

Most sincerely,

Daniel S. Bleil

C000324

**Stuart W. Volkow**
Box 5755 Santa Monica CA 90409
SKYPE: **svolkow**  svolkow@gmail.com
www.linkedin.com/in/**svolkow**

November 11, 13

Steven Yurowitz
Newman and Greenberg
950 Third Ave

## IN SUPPORT OF HOWARD LEVENTHAL
### New York, NY 10022
via email: syurowitz@newmangreenberg.com

Mr. Yurowitz:

I am a California resident and have known Howard Leventhal for over 45 years since approximately the 5th grade. This letter is in support of his defense and liberty.

Mr. Yurowitz:

I am a lifelong friend of Howard Leventhal , residing most of my life, full or part time in the Chicago area.

Howard is a loyal friend and family man who has worked diligently and had many business successes. I have been at all three of his weddings and have seen first hand his unwavering support of his aging parents, daughter Amelia, and disabled first wife Judy. All of this support has been with great personal sacrifice. This is especially true of his continued quarter century support of his completely disabled first wife Judy, keeping her from institutionalization. I witnessed first hand the depth of his commitment to family as he cared for his father in his final years. I have witnessed numerous times how he helps support his quadriplegic cousin Neal. For certain, Howard is, and has been pivotal in the support of numerous people in his family circle both financially, logistically and emotionally.

Howard has a unique combination of talent and ability combining technical skill in electronics and design with marketing savvy. I have seen first hand his ability to articulate and design complex products and bring them to market. I have worked with

him many times as a consultant on several of his businesses including Quicksite, Stealth Media Labs, U.S. Telematics, and Heltheo. As an expert in mobile Internet technology I can attest that to the feasibility of the eNurse Companion mobile home health monitoring product, brand named The McCoy. It integrates readily available off-the-shelf technologies.

As boys of 14 or 15 we trained together in an Explorer Post in Skokie Il. where we learned first aid and ran emergency communications operations. Howard always performed at an excellent level.

Around that same time Howard began training in Tae Kwon Do about a year after myself. I trained and competed with Mr. Leventhal through my college years when we both attended Southern IL. Univ. He always conducted himself honorably and has always displayed excellent self-discipline as a practitioner.

Howard is an excellent father and is needed by his adopted daughter Amelia, who is now 13 years old. Regardless of the outcome of these current matters, the person who stands to be hurt the most is of course Amelia, as well as his ex wife Judy and aging mother Lyla.

Sincerely,

Stuart W. Volkow

IN THE UNITED STATES DISTRICT
COURT - EASTERN DISTRICT OF NEW YORK

UNITED STATES
v
HOWARD LEVENTHAL

CASE
13-CR-695
BMC

DECLARATION OF S.D. KRAMER

I, SAMUEL D. KRAMER DECLARE AS FOLLOWS:
I AM AN INMATE AT BROOKLYN MDC, BROOKLYN, NY
THE SAME AS THE DEFENDANT.

I HAVE ONLY KNOWN HOWARD LEVENTHAL A VERY SHORT PERIOD OF
TIME. HOWEVER, IN THAT PERIOD, I CAN SAY THAT ON TWO DIFFERENT
OCCASIONS IF NOT FOR HIM I MAY NOT BE ALIVE AT THIS MOMENT.
IN LATE JANUARY 2016, I WAS FEELING ILL AND HAD REQUESTED
MEDICAL ASSISTANCE. AFTER HOURS OF NEGLECT I ADVISED HOWARD OF
MY CONDITION. HE PROCEEDED TO TAKE MY PULSE AT WHICH TIME HE
NOTICED AN ARRYTHMIA, HE THEN PROCEEDED TO ASSIST ME TO MY
CELL AND REMAINED CONTINOUSLY CHECKING MY PULSE WHILE INSTRUCTING
ME TO RECLINE AND RAISE MY FEET OF THE GROUND. HE THEN
VIGOROUSLY PROTESTED THE LACK OF CONCERN OF THE MEDICAL STAFF VIA
A VERY FRIGHTENED CORRECTION OFFICER. I WAS TAKEN TO A LOCAL
MEDICAL CENTER SHORTLY THERE AFTER. ON ANOTHER OCCASION, HE
WATCHED OVER ME FOR HOURS WHILE AWAITING MEDICAL STAFF. HE IS
ALSO INSTRUMENTAL IN TEACHING G.E.D. CLASSES, COMPUTER TRAINING
COURSES, JUST TO NAME A FEW. I HAVE WATCHED MR. LEVENTHAL
BROOD ALL DAY EVERDAY IN ENDLESS SELF FLAGELLATION, OBVIOUSLY FOR
WHATEVER CRIME HE COMMITED.
    WHILE I HAVE NO IDEA IF THIS LETTER/AFFIDAVIT WILL MEAN
SOMETHING TO THE COURT, I CAN SAY HOWARD HAS MADE A DIFFERENCE
IN THE LIVES OF THOSE AROUND HIM IN THE SHORT TIME WE HAVE BEEN
TOGETHER, IN MY EXPERIENCE BOTH IN AND OUT OF PRISON, AND
THAT MAKES HIM A VERY RARE PERSON.

Samuel D. Kramer                    2-14-16

Earl Weiss
10024 Skokie Blvd. #240
Skokie, IL 60077

847 679 5580

May 7, 2015

Honorable Judge
Brian M. Cogan
United States District Court
Eastern Div. of New York
225 Cadman Plaza East
Brooklyn, NY 11201                    RE: *U.S. v. Leventhal*

Your Honor:

This letter is in support of Mr. Howard Leventhal, Defendant in the above captioned matter, whom I have known personally since 1973. I am an attorney licensed in the State of Illinois, admitted to the Illinois bar in 1980 and a graduate of De Paul University School of Law. I humbly submit the following:

I am an 8th degree black belt in Taekwon-Do, one of a handful in the USA to achieve this rank. My instructors along the way have included the Founder of Taekwon-Do, the late South Korean Army General, Choi Hong Hi. Howard was my senior early on, a black belt before me, an assistant instructor for our *Sabumnin* (instructor) and among my earliest teachers. In the course of my martial arts career, I have taught many of students directly and indirectly through classes and seminars, some of whom also became instructors.

Howard's dedication and work ethic, at least in some small way, is embedded in the students that followed his example.

Martial art instruction is transmitted partly through inspiration. A good teacher mixes instruction and repetition with demonstrations that appear almost superhuman to students, inspiring them to eventually perform the same feats. I was inspired in this way by, Howard, who was the only one to kick a suspended heavy bag once and make it hit the ceiling three times in response.

Howard was of a teacher, who led by example with focus and energy. He provided students with a window into their potential.

He was a fierce, fighter who competed in the open heavyweight division at tournaments. Our instructor Dr. Greggory Youstra, VI Dan, assigned him to teach the youngest K-3rd grade students at our Morton Grove Park District classes. It is not easy for an intense martial artist to dial it back and present lessons gently for the mentality and physicality of children. Dr. Youstra could see that Howard is adaptable and suited for the challenge.

While many years have passed since then, I am certain that regardless of whatever misfortune has brought Howard before the Court, qualities which lit a fire under me as a young person can and should still be harnessed. I strongly encourage the Court to give serious consideration to sentencing in this matter which is focused upon community service, productivity and enriching the lives of people

The United States does not need yet another prison inmate. The corrections system as it presently exists in the United States does little to rehabilitate the incarcerated or benefit society. No higher or better agenda could be served than by allowing Howard to pay his debt to society in a very real and tangible way by being just such a soldier in this war.

Yours truly,

Earl Weiss

Victor Adara

Reg: 76893-053
Metropolitan Detention Center
P. c Box 32 9002

Brook Lynn NY 11232

September 15 2016

Judge Brian M. Cogan
United states District court
225, Cadman Plaza East
Brooklyn NY 11232


Judge Cogan:

I have just had a very bad experience
with defendant Howard Leventhal in a
case before you and I want you to
know about it.

Assistant united states Attorney
Winston Paes contacted my defense
attorney to tell her that Mr.
Leventhal Signed my name to something.
This charge is false!

A couple month ago Howard and I watched as
correction office here left a man who might
have had a very bad injury just lay on the
conerete floor for an hour before putting him
on a stretcher and bringing him downstairs.

EXHIBIT 14-1

Howard offened to help as he
always does and he was told to back
off. He and I started writing notes
about this event including time involved
getting this man out of here. Then
Howard typed the not into an email to
the warden. Printed it out, ask me to
Co. Sign it which I did.

In my Country in Africa we would not
poison a lion by feeding it any
Person who would accuse anybody else
falsely. I Signed the letter exactly as
it show. My lawyer said to me that
this Proseater must hate your friend very
much to do a thing like this.

I have sat at same table with Howard
and taken almost every meal with him
almost every day since he came to MDC.
He does not hide with the white people.
he sits with a table only Africans.
Today I was sentenced in my case to the
lowest possible sentence and because of
Howard's help and stratgy. instead of

Being isolated from my family for
another year. I will be Probably
Once On a treaty transfer to my family
in England before next year is finished.
My lawyer knows nothing about this.
and Howard gave me Perfect direction.
how to do

He also help another of my Country-
men named Kinsley Koloko, Kinsley to
claim asylum because he had been attacked
in Nigeria for reason having to do with his
Personal Preferences. Howard wrote
justification for not deporting Mr. Kinsley
back to Nigeria May and today Mr. Kinsley
is working in New York in a medical
occupation under no further threat of
deportation.

Howard is suffering here for not
having good contied with his daughter.
He talke to me about almost
nothing else almost every day. I wish
you Sir - will please - allow him to
also be home with his daughter
because he deserves it, and she
deserves to have his kind of father.

Sincerely,

PETER Adjoara

Clifford M. Gross, Ph.D.
11930 North Bayshore Drive
North Miami, Florida 33181   Tel 813-393-0756

To Whom It May Concern
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

November 20th, 2013

Dear Honorable Sir or Madame,

I am providing this character reference on behalf of Howard Leventhal and I understand that he has or will enter a guilty plea in the matter before you.

I've known Howard for more than 12 years. I was introduced to Howard by Schneider Securities, an investment bank I had engaged to complete a public offering in 2000. I have been a professor (NYU, NYIT and USF) and department chairman; I've founded and taken public two companies, one on the NASDAQ and one on the American Stock Exchange. Combined, I served as the CEO and Chairman of the Board of Directors for a total of approximately 20 years. I have also served as CEO and President of a Canadian government, provincial venture capital fund. Currently, I am CEO of a technology company based in Oxford, England. I hold a Ph.D. from New York University and an M.B.A. from Oxford University. Additionally, I serve on the Board of Directors of the State University of New York at Empire State College and the Board of Directors of the Technology Transfer Society. I am a listed inventor on 19 issued patents and an author/co-author of four published books.

I think Howard is a good and decent man who works extraordinarily hard in the emerging technology space. Soon after I was first introduced to him, although he was highly engaged in growing a new company, he took the time to travel to China to adopt a mal-nourished child and bring her back to the U.S. Through my interactions with Howard over the years, Howard always seemed to be a caring and attentive father.

Howard is a skilled aircraft pilot. On one of his flights, which was recounted to me because his passenger was a technologist I had introduced to him, the electrical system of plane failed. Through his steadfast action and resolve Howard was able to safely land the plane saving not only his own life, but also the life of his passenger. In the Talmud, Sanhedrin 37a states:

"FOR THIS REASON WAS MAN CREATED ALONE, TO TEACH THEE THAT WHOSOEVER DESTROYS A SINGLE SOUL... SCRIPTURE IMPUTES [GUILT] TO HIM AS THOUGH HE HAD DESTROYED A COMPLETE WORLD; AND WHOSOEVER PRESERVES A SINGLE SOUL..., SCRIPTURE ASCRIBES [MERIT] TO HIM AS THOUGH HE HAD PRESERVED A COMPLETE WORLD."

In my business dealings with Howard, an investment company I was running had made an investment in an early start-up he founded. The investment did not work out as often happens with new technology investments. However, Howard proceeded to do something remarkable and unexpected. When he started a new company, he issued a pro-rata amount of shares to our firm, to equal the amount we had lost in the previous investment. This was done without requirement, mention or request from us. Over the past 25 years I have invested in more than 75 early-stage companies. Most don't succeed, as is characteristic of the early-stage investment class, a few thankfully have worked. None of our other investments that haven't worked have ever endeavored to repay our initial investment. Howard's action really stood out in my mind as an indication of good character and dedication; partly perhaps because it was so unexpected.

Irrespective of any mistakes Howard has made, I believe him to be a good man and a good father. I firmly believe that a person's past and future should not be described by a few actions, but the assessment of an individual should ideally reflect the totality of choices made and actions taken.

I plead before the court that you show compassion to Howard Leventhal. I understand that he has done wrong there is a price to paid, but I also remain enthusiastic and hopeful as to the additional good Howard can and will do in his remaining years, should he have the opportunity to do so.

Sincerely,

Clifford M. Gross, Ph.D.

REPLY TO
POUGHKEEPSIE OFFICE

## RUDOLPH. P. RUSSO
Attorney and Counselor
35 Market Street
Poughkeepsie, New York 12601

Telephone: (845)452-9010
Fax: (845)473-8122

BRANCH OFFICE

P.O. Box 189
Hopewell Junction, NY 12533
Telephone: (845)226-7002
Fax: (845)226-0880

December 2, 2013


Sentencing Judge
US District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11207

      Re:   People v. Howard Leventhal

Your Honor:

I am Graduate of The Columbia Law School and have practiced law in the State of New York since 1957. Since that time, in addition to my law practice, I have served as, among others, a Town Justice, a member of the Dutchess County Legislature, Chairman of the Dutchess County Legislature, a member of the Board of Trustees of The Dutchess Community College, attorney for the Dutchess County Legislature and attorney for the Dutchess Community College.

I have personally known the defendant, Howard Leventhal, since approximately 1997. I met Mr. Leventhal through my brother-in-law who, at the time, was in the investment banking business. Since 1997, I have personally invested in a number of Mr. Leventhal's enterprises. Although all of these endeavors were not commercially successful, in almost every instance Howard did, in fact, develop and/or bring to market the intended product.

Among these products was "QuickSite", a CD-ROM software which enabled small businesses to create their own e-commerce websites. This product was distributed nationally and in July of 1999, PC Computing Magazine gave it a 4-star rating with the comment that "QuickSite Gold is the friendliest of the bunch..." and "...the easiest way to set-up shop". To my knowledge, this product was totally and solely developed by Howard.

In 2002, Howard, together with 2 researchers at the University of Miami developed THE STEALTH CHANNEL DIGITAL WATERMARK, which was subsequently awarded U.S. Patent #7,079,633. Although this product did not reach commercial success, it was a ground-breaking development in the prevention of piracy of digital goods such as music, movies and TV programming.

In 2005, Howard, along with two others, co-authored a book entitled, "Are We There Yet? Road Trips in the 21st Century. This book, which is still available today, educates parents about using electronic methods of entertaining children on long car trips.

In 2007, Howard introduced the Vivee voice interactive messaging for retrieving email in automobiles. The purpose of this product was to allow drivers to retrieve email without distraction.

In 2008, Howard, together with consulting engineers, developed the Voyager Mobile Television, which allowed the reception of live TV in moving automobiles. Voyager was demonstrated at the January 2008 Consumer Electronics show in Las Vegas.

I have been advised that Howard attended the Southern Illinois University and the University of Illinois, but did not graduate. Obviously, he is a self-taught engineer and an accomplished inventor, despite his lack of formal education. A number of years ago, Howard's father told me that when Howard was 12 years old, the local police agency sought his assistance in establishing their radio communication system.

Throughout the years that I have known Howard, I have never known him to be anything but honest and straightforward and as far as I can ascertain, he has absolutely no prior criminal history.

In the instant case, Howard, apparently under intense pressure to finance his latest undertaking, exercised extremely poor judgment for which he must atone. However, it would appear to me that no useful purpose whatsoever would be served by sentencing Howard Leventhal to any term of imprisonment.

Very truly yours,

RUDOLPH P. RUSSO
RPR:sb

2

# Exhibit F

**Proposed Opinion and Order**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

UNITED STATES,

        Plaintiff,

vs.

HOWARD LEVENTHAL,

        Defendant

Case No.: 13-cr-844

OPINION AND ORDER

December 4, 2020
ANDREA R. WOOD, District Judge

# OPINION AND ORDER

This matter is before the Court on defendant Howard Leventhal's Second Motion for Early Termination of Supervised Release filed November 4, 2020. For the following reasons, the Court **GRANTS** the motion.

## BACKGROUND

In December 2013 the defendant pled guilty to one count of wire fraud and one count of aggravated identity theft in the interceding matter, Case No. 13-cr-695(BMC) in the United States District Court, Eastern District of New York (the "EDNY Case")[1]. On September 12, 2015, fourteen months prior to sentencing, defendant was remanded to custody of the Bureau of Prisons for alleged violations of conditions of pre-trial release terms, denied by the defendant.

---

[1] Note that while this matter was originally filed in this court under this case number, it was almost immediately transferred to the United States District Court for the Eastern District of New York (EDNY) where the bulk of proceedings took place.

OPINION AND ORDER - 1

On December 6, 2016, defendant was sentenced in the EDNY Case to 60 months imprisonment to be followed by three years of supervised release[2], with credit for time served in pre-sentence detention. Defendant was ultimately transferred to two succeeding minimum security federal prison camps after spending 17 months in the maximum security Metropolitan Detention Center, Brooklyn, NY; a facility referred-to in published reports by EDNY Federal Magistrate Judge Cheryl Pollak as being like a "Third World Prison[3]."

Subsequently Leventhal was transferred from Federal Prison Camp Duluth to a Residential Re-Entry Center in Chicago on April 12, 2019 and transferred to home confinement on May 16, 2019. Defendant's period of imprisonment (per official record of the Bureau of Prisons) ended on December 12, 2019, the day his period of supervision by Probation should have begun under controlling law. Defendant claims that inception of supervision under authority of United States Probation actually began six months earlier, during late May or early June 2019. The Government disagrees.

Mr. Leventhal no longer wants to be on supervision and has filed two motions requesting termination of his supervised release; the first filed in May 2020 in this matter[4] and the second instant motion filed on November 4, 2020, to which the court now responds and rules.

During the proceeding in this matter which took place on July 30, 2020, Mr. Leventhal's currently-assigned NDIL Probation Officer Jay Nichols, while objecting to the earlier petition for termination, stated on the record that he did not foresee any objection to

---

[2] The sentencing court initially ordered 5 years of supervised release, however after being advised that the law did not allow a term exceeding three years, amended the judgment downward to three years of supervised release. See amended Judgment of Conviction, EDNY Doc 177.
[3] See https://patch.com/new-york/sunset-park/federal-judge-appalled-third-world-brooklyn-prison
[4] Denied without prejudice for being prematurely filed.

granting a later petition, provided that the effective date would be no earlier than December 12, 2020. The Government agreed.

The Government stated two objections to Leventhal's earlier petition: 1) That the statutory minimum for early termination under 18 U.S.C. § 3583(e)(1) of one year under supervised release had not yet been met; and 2) that there was some (vaguely articulated) joint concern on behalf of both the Government and Probation that Leventhal had not complied with the sentencing court's order for behavioral health care during supervised release. Over the four months since the Government and Probation stated these two objections on the record, no new objections, notices, complaints or filings on their parts expressing objection to terminating supervised release early have been asserted.

On December 12, 2020, according to the reckonings of this court, the Government and Probation, the statutory minimum of one year under 18 U.S.C. § 3583(e)(1) will be met in this case, allowing for grant of early termination on said date.

## DISCUSSION

Leventhal's motion to terminate supervised release is based on § 3583(e)(1), which allows the Court under certain circumstances (which the Court discusses and presents here) to terminate a term of supervised release "at any time after the expiration of one year of supervised release." 18 U.S.C. § 3583(e)(1). Section 3583 generally governs inclusion of supervised release after imprisonment and provides for specific terms of supervised release for various categories of crimes, the factors to be considered by the court, conditions of supervised release, as well as early termination, modification and revocation. In particular, "[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(c), (a)(2)(D), (a)(4), (a)(5), (a)(6), and

(a)(7)-terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). "The language in this statute is discretionary, and the district court has wide discretion in determining whether to terminate an individual's term of supervised release." *U.S. v. Hook*, 471 F.3d 766, 771 (7th Cir. 2006).

At threshold, the Court finds that as of December 12, 2020, Leventhal meets the one-year requirement set forth in section 3583(e)(1).  As for Section 3553(a)(1) (the nature and circumstances of the offense and the history and characteristics of the defendant), the Court notes that while the offenses for which Leventhal was convicted are serious, they are non-violent. Moreover, the Court finds significant the Probation Department's representation that Leventhal, who is 64 years of age, has meaningfully complied with the Judgment of Conviction's major terms of supervised release.

The Court also notes from Mr. Leventhal's sworn, self-authored "Sealed Post Release Report" that Leventhal maintains a stable residence, provides nearly 24/7 in-home care for his 95 year old mother and is enrolled (with low fee senior citizen status) in a college program leading to a Bachelor of Science degree in Architectural Engineering.  He has performed "tech-temp" temporary work gainfully on occasion and receives Social Security retirement income. As a full-time undergrad engineering student, full-time elder caregiver and part time electronics technician, Leventhal's time is fully consumed with pro-social activities. He is under no pressure (like the pressures he was under during commission of his criminal acts) for the daily expenses of living.  None of the commonly widespread deleterious economic harm of the COVID Crisis have meaningfully affected him negatively, according to him.  He and his mother occupy the

OPINION AND ORDER - 4

same household, both qualify for and receive full coverage government-funded medical care as well as more than sufficient retirement income, so there are no money pressures in the defendant's home. Moreover, Leventhal had no prior criminal history prior to his conviction on the present offense. On balance, these factors weigh in favor of early termination.

As for Section (a)(2)(B) (affording adequate deterrence to criminal conduct), the Court finds that the deterrent value of this case has been fully realized and that there is no longer any need to keep Leventhal on supervised release. His offenses were non-violent and he served an extended prison sentence. He will be within 8 days after the hearing on this instant motion, of completing one year towards his term of supervised release. He was compliant was court-imposed fees and restitution to the limit of his ability.

As for Section (a)(2)(C) (to protect the public from further crimes of the defendant), as noted above, Leventhal is now less than one year to his 65th birthday. The likelihood of recidivism by an over-65 offender is very low. See *U.S. v. Nellum*, No. 2:04-CR-30, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (observing that "under § 3553(a)(2) (c), age of the offender is plainly relevant to the issue of protecting the public from further crimes of the defendant.") (citation and internal quotation marks omitted). Moreover the Probation Department indicates that Leventhal is on low-activity supervision because he qualifies as a low-risk offender. His current pursuit of college-level education as a freshman among 18 year-olds, 45 years after dropping out of college, indicates newfound humility, pro-social, contributory and productive inclinations. His employment and retirement income status indicates that he has returned to a stable environment and therefore presents a lower risk of recidivism. These considerations weigh in favor of early termination.

As for Section (a)(2)(D) (to provide the defendant with needed medical care), the Court notes that Leventhal was materially neglected in terms of medical care for a serious medical condition. The sentencing court made it perfectly clear to the Bureau of Prisons that Leventhal required specialized medical care while imprisoned. Yet, there is nothing in Bureau of Prisons records establishing that he received any such care and no such care was provided. Rather, such care was actively and deliberately denied.

Although Leventhal states that he was re-certified medically as an FAA-licensed pilot after release, according to subsequent medical testing and reports, he suffers serious degradation and exacerbation of his principal medical condition as a result of neglect while imprisoned, according to his physician. The most clear and present consequence of this degradation has arisen from the extraordinarily elevated number of bathroom trips which Leventhal must suffer daily – which produces the further collateral effect of rendering Leventhal's earlier-expressed wish and intent to pursue a post-release career as a flight instructor providing "dual" instruction in small aircraft without lavatories, nearly impossible and surely impractical.

While Leventhal may or may not be in the final stages of life, it is likely that medical neglect during incarceration shortened his life expectancy. These considerations also weigh in favor of early termination. See *Nellum*, 2005 WL 300073, at *4 (observing that Section 3553(a)(2) requires judges to impose sentences that effectively provide the defendant with needed medical care) (citation and quotation marks omitted).

Both the Government and Probation claimed in the previous early termination proceeding that Leventhal has somehow himself been non-compliant, un-cooperative or refused to comply with the Court's order regarding mental health care. Rather in fact, Leventhal in terms of provider encounter frequency has exceeded Probation's requirement. Moreover Leventhal

OPINION AND ORDER - 6

claims that Probation initially assigned an unlicensed, unqualified social worker to him, that said

social worker was not only one third his age, unfamiliar with patients of his background but also,

although "a perfectly respectable young woman" not up to the task of providing any useful

therapy to Mr. Leventhal, according to him. The successor (qualified, licensed) psychotherapist's

report indicates that Leventhal is in more than full compliance with the court's sentencing order,

which mandates no particular clinical outcome. Said report also suggests that Leventhal would

benefit on a clinical behavioral level from termination of supervised release without delay and

that continued supervision would be harmful to Mr. Leventhal.

Family ties are pertinent under § 3553(a). *Nellum*, 2005 WL 300073, at *4. Mr.

Leventhal forcefully claims in numerous filings on record in this court during 2020 that his

"cherished relationship with his beloved daughter" was deliberately destroyed by EDNY

Government and Probation personnel – as a *quid pro quo* provided to Mary Handeland, his

second ex-wife[5] for perjured testimony during the sentencing phase of the EDNY Case.

---

[5] Leventhal claims that his divorce proceeding from Mary Handeland, in *Handeland v. Leventhal*, Case No. 05 D 808, 19th Judicial Circuit Court, Lake County, Illinois was hotly contested and ran as one of the longest duration unresolved divorce cases in local history; and that Handeland concealed, among other things, a drug trafficking arrest of herself, a suicide attempt, "decades" of premarital antipsychotic prescription drug use and other psychiatric treatment – serious, material, core issues in adoption and nothing of which was disclosed to either the Defendant, the PRC Government or the U.S. State Department prior to international adoption of Defendant's daughter in China. Defendant further claims that this failure to disclose constituted a federal felony on the part of his ex-wife, under 18 USC § 1001, False Claims in federal proceeding, for the singular purpose of perpetrating theft by deception of enormous sums of money, assets and parental rights from Leventhal. Defendant further claims that part and parcel to the *quid pro quo* delivered to Handeland by the Government and Probation for Handeland's perjury in this matter, amounted to furtherance of concealment of these crimes, by isolating the Defendant in prison for "as long as possible" (see Handeland's sealed letters to the sentencing judge in record of the EDNY case, during 2016). The court takes judicial notice that none of these allegations were denied by the Government in its Doc No. 21 response to Leventhal's first petition for early termination, which particularizes the above allegations.

In summary, Leventhal claims that Handeland (adoptive mother of his adopted daughter) was coached and suborned to perjury by the EDNY Prosecutor and EDNY Probation's PSR writer to falsely advise the sentencing court 1) That Leventhal's medical condition was not as serious as Leventhal claimed; and 2) That Leventhal presented some sort of threat to his daughter. Leventhal contradicts and his many personal reference letters support, that for the entire duration of his adopted daughter's life while he acted as her father, neither his ex-wife nor any other person ever once wrote or uttered a single word to him or about him in the remotest way suggesting that he (Leventhal) posed any sort of threat to his daughter – and that rather, diametrically the opposite is true. This "ludicrous accusation" was concocted by EDNY personnel according to Leventhal's analysis and interpretation, solely for purposes of producing and publicizing Leventhal's lengthy sentence, to self-promote and self-amplify the prosecutor's monetary income in his current, post-public-service private practice - with no basis in fact whatsoever. The Government denied none of this in its answer to Leventhal's original petition for early termination.

The medical consequences suffered by Leventhal while neglected in prison speak for themselves as to the falsity of the ex-wife's claim that Leventhal exaggerated assertions about his medical condition prior to imprisonment. Nothing of Mr. Leventhal's allegations as summarized in the above three paragraphs and asserted in his earlier petition have been denied by the Government; therefore the court is obliged to deem them true. The court must accept as true all undenied factual assertions in the (litigant's) submissions and resolve all disputes regarding relevant facts in the (litigant's) favor. *John Walker and Sons, Ltd. v. DeMert Dougherty, Inc.*, 821 F.2d 399, 402 (7th Cir. 1987); *Oce-Office Systems, Inc. v. Eastman Kodak Co.*, 805 F. Supp. at 643; *Neiman v. Rudolf Wolff Co.*, 619 F.2d at 1190; *Hexacomb v. Damage Prevention*

OPINION AND ORDER - 8

*Products,* (N.D.Ind. 1995), 905 F. Supp. 557, 560 (N.D. Ind. 1995)]. These considerations weigh in favor of early termination, particularly so that Mr. Leventhal may attempt to re-establish contact with his daughter while she is still in college and still resides within driving distance of him, without further interference by the Probation Department.

As for Section (a)(7) (the need to provide restitution), the Court notes that, according to his sworn Post-Release Report, Leventhal has paid more than the amount of restitution mandated by the terms of supervised release. He expresses a wish and intent to continue paying restitution to whatever extent is practical and manageable, directly to his victims regardless of any order compelling him to do so.

As to satisfying the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a) regarding the need to avoid sentencing disparities[6] and the principle of sentencing "not greater than necessary," the Court takes note of two closely and directly comparable cases which produced sentences orders of magnitude less harsh than that imposed in this case. The first, in the same district and court where Leventhal was sentenced is Case No. 11-CR-255, United States District Court Eastern District Of New York *in United States v. Klein.* The second is *U.S. v. Matassa*, Case No. 17 CR 373 before Judge Matthew Kennelly of this court.

Matassa's PSR writer penned the following statement about Matassa: "Defendant is a Chicago native who had a seemingly normal upbringing[7]," when in fact Matassa and his family

---

[6] 18 U.S.C. Section 3553(a)(6) requires sentencing judges in federal court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

[7] 1:17-cr-00373 Document #: 67, Page 10 of 16 Page ID #:774

OPINION AND ORDER - 9

according to decades of published newspaper reports, were publicly identified innumerable times as being high ranking members of a Chicago Organized Crime family. See Chicago Tribune article June 22, 2019: "*Reputed 'made' member of Chicago Outfit given 6 months in prison for embezzling from union*"[8].

Neither Howard Leventhal nor any known member of his family going back to their immigration into the United States in the late 1800s, had ever once entered a criminal court, aside from traffic, claims Leventhal. Matassa stole irreplaceable labor union retirement and medical funds for his personal consumption. Leventhal claims that he committed his admittedly criminal acts to fund an authentic technology development company under desperate circumstances in the aftermath of the 2008 stock market crash, while supporting three families including one with a dying (earlier) ex-spouse who needed otherwise unobtainable 24/7/365 care. He also claims that he took extraordinary care to make certain that his victims could withstand and recover from the losses he produced; not that any of this excuses the criminal conduct to which the defendant admitted.

John "Pudgy" Matassa's age at the time of sentencing was within a few years of Leventhal's age at sentencing. Both had serious medical issues yet the prosecutor in Matassa's case did not waste more than a year of Matassa's life trying to invalidate the presence of these issues, as the prosecutor did in Leventhal's case, producing manifest physical harm in the present day to Leventhal. Decades of published reports show that Mr. Matassa was a lifelong professional criminal from a family of lifelong professional criminals. Matassa was sentenced to

---

[8] https://www.chicagotribune.com/news/criminal-justice/ct-reputed-chicago-mob-figure-sentencing-20190722-kahyuutmzvc7jpnu6uqvc6oiz4-story.html

6 months versus the 60 month sentence for Leventhal.  Matassa's parent-child relationship was not deliberately destroyed by the Government and Probation as a *quid pro quo* for a confidential informant's perjury, as Leventhal's was. This comparison establishes a **gross and unwarranted sentencing disparity of 1,000%** when measured in simple numbers. It is exceedingly difficult however in practical terms, to precisely enumerate the harm caused to Leventhal and his daughter, by the deliberate destruction of his relationship with his daughter – not suffered by Matassa.  The Matassa comparison however pales in comparison to Klein.

Philip Klein was in the same age range at sentencing as Matassa and Leventhal, also with serious medical conditions[9]. Klein embezzled funds allocated for the support of children and federal Head Start Program monies. To the extent monies obtained illegally by Leventhal were not used for bona fide business expenses, the remainder was used (according to Leventhal) to support an ex-spouse afflicted with Multiple Sclerosis dying in agony and the humiliation of the loss of body function control; as well as Leventhal's aged parents, his daughter adopted as an abandoned foundling in China; and Leventhal's stepchildren. Klein was sentenced to one day of imprisonment – an **unwarranted sentencing disparity of 1,825 times or 182,500% versus Leventhal**. What explains these disparities? Mr. Leventhal expresses an unsupported misconduct conspiracy theory, however the sentencing disparities speak for themselves to establish that the sentence in Leventhal's case was far greater than necessary, particular in light of the deliberate destruction of relationship between the Defendant and his only child, which the Government has not denied was planned and executed by EDNY Prosecution and EDNY Probation, among others. It is unsurprising from Leventhal's viewpoint, that he is repulsed by the thought of any ongoing contact whatsoever with Probation personnel going forward.

---

[9] See "Amended Statement of Reasons" in Klein case, dated December 27, 2011.

OPINION AND ORDER - 11

Lastly, the public interest is best served by terminating Leventhal's supervised release because this will allow the Probation Department to invest the public's limited resources on those who are truly in need of supervision. Due to the current Coronavirus Crisis especially, Probation staffers are quoted on public record[10] stating that an above normal rate of early releases of vulnerable prisoners have placed them (probation officers) under an excess, unmanageable burden. There is no benefit to be derived by maintaining supervision at public expense over someone like Leventhal who has shown himself to be beyond the need for supervision, to have been directly harmed by Probation officers without justification or legal basis and to whom some minimal opportunity is surely due, to re-establish some manner of contact and relationship with this daughter, which has been unduly barricaded-against by Probation itself, while reconnection may remain practicable and possible.

## CONCLUSION

Defendant Howard Leventhal's Second Motion for Early Termination of Supervised Release is **GRANTED**. Accordingly, the Court **ORDERS** that Leventhal's previously-imposed period of supervised release is **TERMINATED effective 12:01AM, December 12, 2020.**

**SO ORDERED**.

_____
ANDREA R. WOOD
UNITED STATES DISTRICT COURT JUDGE
Date: December 4, 2020

_____

[10] See for example: https://www.themarshallproject.org/2020/04/03/probation-and-parole-officers-are-rethinking-their-rules-as-coronavirus-spreads